[Cite as *In re J.B.*, 2015-Ohio-460.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

In re J.B., A.P., T.P., C.P.

Court of Appeals Nos. S-14-005
S-14-006
S-14-007
S-14-008
S-14-009
S-14-012
S-14-013
S-14-014

Trial Court Nos. 21130260
21130261
21130262
21130263

**DECISION AND JUDGMENT**

Decided: February 6, 2015

* * * * *

Mollie B. Hojnicki, for appellant Am.P.

Stephen D. Long, for appellant R.P.

Cindy A. Bilby, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} This is a consolidated appeal from a judgment issued by the Sandusky County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, Am.P. ("mother"), and appellant, R.P., and granting permanent custody of the minor children to appellee, Sandusky County Department of Jobs and Family Services. For the following reasons, the judgment of the trial court is affirmed.

{¶ 2} Mother sets forth two assignments of error:

I. The evidence submitted at trial was insufficient to support the trial court's grant of permanent custody.

II. The trial court committed error by considering as evidence the testimony of a witness who was not duly sworn.

{¶ 3} R.P. sets forth four assignments of error:

I. The trial court erred in granting appellee Lucas [sic] County Children Services Board's motion for permanent custody as the decision was against the manifest weight of the evidence.

II. The trial court committed structural erro [sic] where it allowed the testimony of a witness who was not duly sworn.

III. The trial court committed plain error where it allowed the agency to present witnesses whose testimony was irrelevant to the issues before the court or who merely duplicated the testimony of other witness, thereby denying appellant, [R.P.], a fair trial and due process.

2.

IV. Appellant, [R.P.], was prejudiced by ineffective assistance of trial counsel.

**Procedural History**

{¶ 4} Appellant, Am.P., is the biological mother of four children: J.B. (born in June 2006), A.P. (born in September 2007), T.P. (born in October 2009) and C.P. (born in July 2011). Appellant, R.P., is the biological father of A.P., T.P. and C.P. R.B. is the father of J.B. R.B. is not a party to this appeal.

{¶ 5} On November 22, 2011, appellee filed a complaint alleging abuse, dependency and neglect of J.B. and complaints alleging A.P., T.P. and C.P. were dependent children. Following the complaints, temporary custody of J.B. was granted to S.P., R.P.'s mother.

{¶ 6} An adjudicatory hearing was held and J.B. was found to be neglected and dependent while the other three children were adjudicated dependent. J.B.'s placement with S.P. was continued and the other three children remained in the custody of their parents.

{¶ 7} On April 12, 2012, appellee filed amended complaints seeking temporary custody of T.P. and C.P. and requesting that S.P. receive temporary custody of A.P. The court granted appellee's requests.

{¶ 8} On July 24, 2013, appellee moved for permanent custody of all four children. A multi-day trial was held in November and December 2013. On February 6, 2014, the court granted appellee permanent custody of the children.

3.

**Permanent Custody Trial**

{¶ 9} Tami Ward, an investigator for appellee, testified to the following. The agency first became involved with mother in February 2006, when she was pregnant with J.B. A "referral call" was made informing the agency that R.B., the alleged father of J.B., was threatening to kill mother and her unborn child. Several other referral calls followed in 2006 alleging, among other things, that mother was allowing her child to have contact with a suspected child molester and that mother, who was schizophrenic and bipolar, was refusing to take her medication thereby placing her child in danger. In addition, calls were made that there was drug activity in the home and that J.B. smelled and was unclean. Mother was offered the program Help Me Grow, which assists new parents with infant development, but she refused to participate in the program.

{¶ 10} In July 2007, a referral call was made regarding the state of mother's home because it looked like a cyclone had gone through.

{¶ 11} By 2008, mother was married to R.P. and had given birth to A.P. In May of that year, a referral call was made with concerns regarding appellants, that they did not work but have cell phones and computer games, yet cannot afford diapers for J.B. The caller was also worried about J.B.'s emotional well-being. In August, there was another referral call reporting that appellants' house was a mess and J.B. and A.P. were not properly supervised.

{¶ 12} In 2010, the agency received more referral calls. There were now three children in the home. In January, the caller indicated J.B. had diaper rash and although

4.

she was not supposed to have dairy products, mother was giving J.B. milk. Later in January, another call came in with concerns that J.B. was not in school and had bite marks from her sister as well as bruises and swollen genitals. The next call came in February 2010, with worries that J.B., who had been diagnosed with a yeast infection, was not being treated. Appellants were offered the program WSOS, which assists with different services like parenting and housekeeping, but refused to participate in the program.

{¶ 13} In May 2010, a call was made indicating J.B. was suffering from diaper rash again which was not being treated and J.B. missed school because she had ringworm. There were many calls reporting that J.B. had a rash and was dirty, unkempt and smelled like urine. Numerous other referral calls were made to report that J.B. was missing school or was late for school. One of mother's explanations was she, mother, "lost track of her days." Other referral calls were made concerning injuries suffered by J.B., which included having marks from a hairbrush on her forehead, having a "goose egg" on her head and missing hair. Mother was again offered Help Me Grow, but refused to participate in the program.

{¶ 14} In October 2010, a call was made indicating J.B. was suffering from a rash which was getting worse and which extended from her legs to her stomach.

{¶ 15} In January 2011, a caller reported both J.B. and A.P. smelled of urine and they were wearing underwear which was stained and "stiff." Both girls had rashes and A.P. had open blisters. J.B.'s rash was from her hip to her thighs, and J.B. cried because

5.

it hurt. More calls were made to the agency regarding the health of the girls. One caller stated the girls were locked in their room all day and forced to relieve themselves on the floor while their parents played on a computer or mother slept. Other callers reported that the girls were always hungry. Another call came in that A.P. had poor attendance at school, was hungry, smelled and was not wearing her glasses for her lazy eye.

{¶ 16} In September 2011, a caller stated A.P. said the following, "Daddy hit mom; is she okay[?], [T.P.] hit floor; * * * Daddy hit Mommy face; Daddy hit [J.B.]."

{¶ 17} There were a total 32 information and referral calls made under mother's name. Referrals calls are documented by the agency and no further action is taken unless an investigation is opened. Therefore, Ward could not testify about the veracity of the statements made in the calls, just that the calls were received. A total of eight investigations involving appellants were opened, spanning from September 2008 to March 13, 2013.

{¶ 18} Debbie Lonsway Glaspy, another investigator for appellee, testified she became involved with the family in February 2011. There were concerns of medical neglect and neglect regarding a rash J.B. had. Glaspy testified she visited appellants who acknowledged that J.B. had a rash which would come and go. Appellants took J.B. to the doctor, and Glaspy followed up with the doctor, who did not have any concerns. On March 17, 2011, Glaspy closed the investigation, finding the allegations unsubstantiated.

{¶ 19} Christina Cook, another investigator for appellee, testified she first became involved with the family in September of 2011, after the agency received a report that

6.

R.P. had physically abused J.B. Cook testified she visited the family and could find no physical marks on J.B. During the visit, appellants told Cook they were having problems with J.B.'s attitude and J.B.'s school. Cook offered to set up a meeting with the school officials. A meeting took place with mother, the school principal, J.B.'s teacher and J.B.'s school counselor. The school employees expressed concern with J.B.'s school attendance, hygiene and the fact that J.B. always seemed hungry. Cook testified she eventually closed her investigation, on November 7, 2011, finding the allegations of physical abuse unsubstantiated, however, as to the other issues with J.B., Cook offered to help, and appellants agreed to a voluntary case for that help.

{¶ 20} On November 14, 2011, the agency received another report of physical abuse against J.B. Specifically, it was alleged that mother hit J.B. in the face leaving a red mark. Cook spoke to J.B. at school and J.B. confirmed the allegation; Cook noted J.B. exhibited a red mark on her face. Cook contacted law enforcement then drew up a safety plan, which appellants signed, and J.B. was placed in the temporary custody of S.P., while the other three children remained in appellants' home. Cook filed a complaint in juvenile court on November 22, 2011, and closed her investigation finding physical abuse indicated, meaning one person said the allegation was true and the other person said the allegation was not true.

{¶ 21} Dr. Randall Schlievert, M.D., testified he is certified in the subspecialty of child abuse pediatrics. In April 2012, the doctor treated 10-month-old C.P. at a Toledo hospital, at which time C.P.'s feet were swollen and discolored and C.P.'s legs were

7.

drawn up and flexed. When Dr. Schlievert would try to straighten C.P.'s legs, they would immediately flex up again. The doctor noticed C.P. had a spot on his lower spine, called a sacral dimple, which could indicate underlying Spina Bifida. An MRI was ordered and came back normal, "so there really was no sign of a spinal problem." Dr. Schlievert was also made aware, through medical records or from other physicians, that C.P. had been covered in feces when he was removed from the home. The doctor determined that C.P. was left to sit in the same position for an extended period of time, months, which prevented C.P.'s normal development, resulting in C.P. having developmental delays. Dr. Schlievert explained that typically, children C.P.'s age, through normal stimulation and human interaction, would be crawling and rolling over. The doctor opined the fact that C.P.'s legs remained in the same position was a symptom which indicated neglect to the extent that it impacted C.P.'s overall development, as C.P. lacked the foundation for future development. The doctor recognized that in addition to neglect, developmental delays can also be caused by genetic conditions like autism and medical conditions, but in C.P.'s case, autism and other medical causes were ruled out. The doctor further remarked if C.P.'s parents provided C.P. with two percent milk, "it would certainly play a role in lack of development." Concerning parenting classes, the doctor observed, in general, "[i]f the caregivers are not recognizing that there is neglect that led to this, I don't see how parenting classes or skills training * * * can adapt to that." The doctor noted if the deficit, the pattern of neglect, is not addressed then

8.

parenting classes are a patching approach and "the mindset that led to that neglect doesn't necessarily go away."

{¶ 22} Lisa Chaffin testified she is employed with the Sandusky County Child Support Enforcement Agency, and J.B.'s father owes $879.70 in child support for her, and R.P. owes $5,613.51 in child support for A.P., T.P. and C.P., as of October 31, 2013. Chaffin stated R.P.'s driver's license was suspended due to his nonsupport, and he was held in contempt in September 2013. Thereafter he made one payment, of $25, for each child. Chaffin testified if R.P. does not pay a purge amount of $972, plus poundage, he will have to report to jail on December 29, 2013, for 30 days.

{¶ 23} Linda Ackerman, a supervisor for appellee, testified she helped develop a parenting plan for appellants in March 2012. The main concerns were: hygiene, R.P.'s relationship with his stepdaughter, J.B., the children's school attendance and issues with structure, routine and organization. Initially, appellants were apprehensive because of their past history with appellee. Ackerman testified mother would want to do what was right, as far as a routine of getting up at a certain time and doing laundry, but there was a disconnect which Ackerman described as "I'm [referring to mother] doing that because I don't want to be in trouble * ** * versus this is the best thing for my children." In Ackerman's observations, R.P. took a backseat to the parenting of the children. Ackerman testified she was concerned that nine-month-old C.P. had not begun crawling yet and his feet were blue. She was also concerned that the other three children showed

9.

signs of being developmentally delayed. Ackerman concluded all four children suffered from chronic neglect.

{¶ 24} Linda McGilton testified she is the Director of Village House, a non-profit organization which provides a safe place for children to visit with their non-custodial parents. Starting in June 2012, appellants were scheduled to visit the four children at Village House three times a week. McGilton testified mother attended 48 of her 50 scheduled visits while R.P. attended 34 of the 50 visits. McGilton recalled that throughout their involvement with Village House, appellants had an ongoing problem with body odor which caused some employees and clients to complain, and even get sick. McGilton described the smell as "an overwhelming stench" which would remain in the room after appellants left, such that the room would have to be aired out for two to three hours "and you had to spray everything down with Fabreze [sic]" before another family was able to use the room. McGilton testified "we had to get rid of the couch in that room and there was a chair that we had to get rid of as well" because "the odor [was] just really strong." In September 2012, appellants' visits were suspended for two weeks due to their odor issue. McGilton testified the problem persisted despite the fact that appellants were continually reminded to bathe and wear clean clothing to their visits. McGilton acknowledged there were periods of time when appellants did well and would bathe and wear clean clothes, but then they would slip and the odor would be back. At one point, Village House gave appellants a basket of toiletries and explained to mother how to use

10.

each item. Village House ultimately terminated appellants' visits because of their failure to remedy their odor issue.

{¶ 25} Christine Uribe testified she was employed at Village House and supervised some of appellants' visits with their children. Uribe recalled that initially appellants' visits were three times per week for two hours, but in October 2012, the visits were reduced to one time per week for an hour. Uribe described the visits in the beginning as chaotic where the girls would scream and R.P. would antagonize the girls to scream louder. Uribe testified during visits, mother interacted with the children, but R.P. would do nothing and would not initiate any interaction with the children; sometimes he would sit and read a book or magazine to himself. Uribe noticed there was not much cooperation between appellants during the visits. Uribe noted mother always filled out a worksheet as to what happened during the visit, but R.P. never filled out a worksheet. Uribe indicated appellants had a "strong odor" which made her sick one time and another worker sick on another occasion. Uribe remembered the odor "stayed in the house for hours after they were gone."

{¶ 26} Nikki Lee, a teacher who works with children with special needs, was one of J.B.'s teachers. Lee testified when she first met the child at the age of five, J.B. had multiple learning disabilities. Lee first encountered mother when mother came to the classroom during the school day and yelled at Lee and threatened to press charges against Lee for calling children services. Lee testified J.B. regularly came to school with a painful rash in her groin area and she smelled badly. In addition, J.B. frequently

11.

complained of hunger. Because J.B.'s clothes were often dirty, Lee brought in clean clothes for J.B. to wear. Lee requested appellants send in tennis shoes for J.B. to wear during recess to keep J.B.'s feet safe and keep mulch out of her shoes, but appellants did not do so. Once J.B. went to live with S.P., Lee noticed J.B.'s school attendance improved, as did J.B.'s hygiene. At the time of trial, Lee testified J.B. was in foster care, in second grade and doing very well in school. Lee testified she is no longer concerned with J.B.'s hygiene, attendance or nutrition.

{¶ 27} Jen Keller, another special needs teacher, testified she had taught J.B., A.P. and T.P. Keller stated J.B. smelled of a "very strong" odor and had severe rashes, while A.P. often came to school hungry, smelling badly and having rashes. Keller said "that smell was the worst smell that I've smelled on a child." T.P. was in foster care when she was in Keller's preschool class. Keller indicated J.B. missed 41 out of approximately 128 days of preschool and A.P. missed about 25 days. When A.P. was at home, she was timid, but after A.P. was in foster care, Keller noticed A.P. was not as withdrawn, she smiled and she was a lot more outgoing and showed an interest in her peers. Keller also testified that despite being contacted by the school, appellants were unwilling to address the problems with J.B. and A.P.'s hygiene, homework and nutrition.

{¶ 28} The foster mother testified she and her husband have been the foster parents of the children for over a year. J.B. was six years old when she came to their house and A.P. was five years old. The foster mother testified the girls could not identify numbers or colors at that time, but now they can. She described J.B. and A.P. as very

12.

"loving girls."  She explained how she gives the girls a snack after school and then helps them do their homework.  The girls have also learned to help with dinner preparations.  After dinner, each child gets a bath, every night, and is read a bedtime story.  The children are then in bed between 8:00 and 8:30 p.m.  The foster mother testified J.B and A.P. have recently started picking out their own clothes for school the next morning.  She recalled J.B. attends speech therapy once a week, J.B. and A.P. each go to counseling once a week, A.P. wears glasses and recently had surgery for a lazy eye, and C.P. goes to physical therapy and occupational therapy once a week.  The foster mother testified although appellants were notified of A.P.'s surgery, they did not attend.

{¶ 29} The foster mother testified that T.P. and C.P. are too young to assist with chores.  When T.P. first came to their home, at three years old, she was not potty trained and she had a speech delay.  However, within a couple of months, T.P. was able to use the bathroom on her own, as T.P. "caught on pretty fast."  The foster mother got T.P. involved in speech therapy and, at the time of trial, T.P. was doing well in preschool.  When C.P. first arrived at the foster home at 13 months of age, he could not walk or speak.  The foster mother testified she helped C.P. through exercising his legs.  She also described C.P. as an emotionless child such that it was hard to determine when he was hungry or thirsty.  She also testified C.P. has one kidney significantly smaller than the other which required testing at a hospital in Toledo.  Appellants were notified of the test but did not appear.

13.

**{¶ 30}** The foster mother indicated after most visits with appellants, the children would have an odor and would have to have a bath right away or be changed right away and "[a]t one point, [she] had to wash their coats and everything because it was so bad."

**{¶ 31}** The foster father testified C.P. began walking within three months of living in their home. He credited the exercises he and his wife did with C.P.'s legs at least three times a day for this accomplishment.

**{¶ 32}** Jami Hill, an investigator for appellee, testified she first became involved with the family in September of 2008, upon receiving a referral that J.B. was home alone. It was determined that J.B. was not home alone, but she was unsupervised for a period of time. Thereafter, Hill went with a parenting aide to appellants' home to offer appellants assistance with parenting, nutrition and developmental expectations/milestones. At the end of October 2008, Hill arrived at appellants' home, and saw J.B. in the window. Hill rang the doorbell and pounded on the door but no one answered. Hill called law enforcement, who then arrived at the home. Mother eventually came to the door, after Hill was there for about 15 minutes, and explained she and R.P. were cleaning out closets. Hill testified it looked as though mother had just woken up. Mother told everyone to leave. Thereafter, a complaint was filed.

**{¶ 33}** Laura Miller, a licensed social worker for Firelands Counseling and Recovery, testified appellee referred R.P. for an assessment, which he completed in February 2013. R.P. was diagnosed with adjustment disorder, which means a reaction to a situation, and antisocial personality disorder, which indicates a pattern of disregard for

14.

social norms, irritability, difficulty in getting along with others and a lack of empathy at times. Miller testified R.P.'s Global Assessment Functioning was 49 out of 100, which demonstrates moderate to severe disruption in functioning in different areas of life like social, occupational and personal. Firelands recommended R.P. attend individual counseling; five visits were scheduled. R.P. attended two of the five visits; the case was then closed.

{¶ 34} Dr. Melanie Jungblut, a specialist in developmental pediatrics, testified she treated C.P. when he was two years old. Appellants and the foster parents were present at the appointment. The doctor described C.P. as fearful, anxious, withdrawn and unable to initiate age appropriate play. Additionally, C.P. exhibited speech disturbance, developmental coordination disorder, sensory integration difficulties, social interaction disorder and a feeding disorder. The doctor opined two percent milk was not recommended for children under three years of age, since two percent milk, as compared to formula, does not have nearly the nutritional requirements a child needs for optimal development. Dr. Jungblut testified C.P.'s failure to show emotion was extremely concerning because it was very unusual, even with children who are delayed. The doctor stated while genetic issue can cause developmental delays and genetics may be a role in C.P.'s delays, she insisted, "I doubt it is the complete explanation." In sum, the doctor found C.P. to be severely developmentally delayed most likely caused by emotional and environmental deprivation and neglect.

15.

{¶ 35} Case worker Kelly Beeker, who was assigned to appellants' case, testified that in October 2008, the agency opened a case because there were concerns that J.B. and A.P. were unsupervised. In November 2008, the two children were voluntarily placed with S.P., but the children were returned to appellants' home in December 2008, against agency recommendations. Beeker stated appellants successfully completed their parenting classes and their assessments and appellee closed the case in July 2009.

{¶ 36} In November 2011, the current case was opened when J.B. was removed from appellants' home and went to live with S.P. J.B. was six years old at the time and not potty trained. Beeker indicated she had concerns about the three children who remained in appellants' home, as the children often missed their medical appointments. When making home visits, Beeker discovered the basic needs of the children were not being met. Beeker observed C.P.'s feet were discolored and he was often left in a play pen with wet blankets. He was being fed two percent milk at six months of age. R.P. did not know where C.P.'s clean clothes were or how to properly clean C.P. when changing his diaper. The home smelled of urine and all of the beds were wet. Mother frequently lashed out as she refused to regularly take her medication for bipolar disorder. Mother also had cognitive difficulties which made it hard for her to care for four young children, much less herself. As for R.P., he appeared to be a very indifferent parent, and he would often be playing on the computer or with trading cards rather than participating with caseworkers or his children. Beeker testified appellants were unwilling to alleviate the

16.

problems in their home, always blaming the school or appellee. Oftentimes, appellants would not allow Beeker into the home for the visits.

{¶ 37} In April 2012, the three remaining children were removed from appellants' home due to several concerns. At that time, A.P. was placed with J.B. at S.P.'s house. A.P. was 5 years old and was not potty trained. T.P. and C.P. were placed in the temporary custody of the agency. C.P. was taken to the hospital for medical assessment and treatment. S.P. eventually asked for J.B.'s and A.P.'s removal from her home because she could not handle the children's behaviors.

{¶ 38} Beeker testified once the children were removed from appellants' home, another case plan was established for appellants. This plan involved therapeutic, mental health and cognitive assessments. Appellants were required to attend the children's medical appointments and participate in school meetings. Appellants went to some of the children's medical appointments, but not on a regular basis, and participated in some school meetings. Mother did attend counseling and met her treatment goals.

{¶ 39} Beeker testified appellants moved numerous times throughout the duration of the case, recalling at least six different places where appellants lived. Beeker stated appellants' current home did not initially have an odor, but over time she has smelled an odor.

{¶ 40} During visits with the children, Beeker saw mother interacting with the children, while R.P. minimally participated with the children. At one visit, Beeker noticed C.P. was chewing on something and she informed appellants. C.P. had a baby

17.

carrot in his mouth, which was considered a choking hazard for a two year old child. At another visit, Beeker indicated mother was changing C.P.'s diaper and was surprised to see that C.P. was uncircumcised. Mother needed assistance from the foster parents with cleaning C.P. before his diaper could be put back on. Also at visits, Beeker observed appellants discussing the case in front of the children. When Beeker told appellants not to talk about the case in front of the children, mother said the kids already know about the case, to which Beeker responded the kids should not know about it. Beeker testified mother would get very stressed during visits, and at a certain point in the visits, she would get frustrated and was ready to go.

{¶ 41} Beeker stated mother reported that she, mother, needs assistance from R.P. with her medications and to remember appointments, as well as to help her with daily living and caring for the children. Beeker testified mother does not understand what the expectations are for her children at their ages and mother cannot focus her attention on making sure that all of the children are safe.

{¶ 42} Beeker indicated it was difficult to work with R.P. and hard to offer him services because he would not cooperate or participate. She noted R.P. does not go to the children's school visits because it makes him uncomfortable. R.P. said helping his wife is like taking care of another kid. Moreover, R.P. blames the problems on his wife, and has no ownership or responsibility with respect to the agency's involvement.

{¶ 43} Beeker testified appellee decided in March 2013, to file for permanent custody of the children because of "the continuous concerns that we had regarding the

18.

care of the children if they would be placed in [appellants'] home" that the children would continue "to be neglected if returned to the home; the fact that we had no family or friends to look into for placement of the children."

{¶ 44} Thomas Aigler testified he has been the guardian ad litem for the children since November 2011. He filed a report on November 5, 2013, recommending permanent custody of the children be awarded to the agency. He indicated his original concerns with J.B. and A.P. were alleviated when they moved to S.P.'s house, as the children's attendance, cleanliness and getting to school drastically and significantly improved. He said the children have not regressed since going to their foster home. Aigler attended three visits between appellants and the children and noticed mother attempting to apply the skills she learned; she did well for about 45 minutes of the hour long visit. Aigler indicated J.B. and A.P. do not want to live at appellants' home, while T.P. does want to live with appellants.

{¶ 45} Mother testified she now accepts help and has learned how to take care of four children. She stated she can care for and dress herself as well as her four children. Mother indicated she understands that it is important to have the kids wear clean clothes and to take them to doctor appointments. She used to sometimes dress the children in dirty clothes, but not anymore. Mother testified she got free, used clothes for the kids at Share and Care, and some of the clothes had stains.

{¶ 46} Mother knew her husband had an odor problem, which bothered her, but she "just didn't pay attention to it, because I figured he'd take care of it on his own." She

19.

also noticed an odor on her children when they lived at home and that bothered her. Mother admitted, between the time that J.B. was removed from the home and the other three children were removed, she was still not regularly bathing the children or taking them to school.

{¶ 47} Mother testified she is on SSI, but recently started working at Sandco. Mother stated she is on medication for her bipolar and paranoia, and the medicine has helped. She does "space out" sometimes and has told a doctor about it. Mother said R.P. is a good parent and he does help care for the children. She said her and her husband's best friend, J.P., never lived with them.

{¶ 48} J.P. testified he has known R.P. for about ten years. J.P. said he lived with appellants, J.B., A.P. and T.P. for about seven months, from September 2010 until January or February 2011. J.P. stated he babysat once for J.B. and A.P. for five or ten minutes. J.P. testified R.P. was a good father and played with the children.

{¶ 49} R.P. testified his work history is "spotty." He stated he started working at Titan Plastics in 2006, then injured his back. Following the injury, for which he received workers' compensation, he had physical therapy but the therapy was never completed. He stated he was let go from Titan Plastics and his back still hurts. R.P. testified since then, he only works at jobs for about a month before his back starts to hurt and he cannot keep up with the pace so he is let go. He said his back hurts during visits with his children and it helps his back if he sits down.

20.

**{¶ 50}** R.P.'s dad died in January 2011, which really affected him. Then, the man who was like a second father to him died in 2013, and this also affected R.P. R.P. testified he does not have a "clear head" and it is hard to focus because of his dad's death, looking for a job and being involved with children services.

**{¶ 51}** Regarding the odor issue, R.P. stated he had an odor problem throughout school, which he says is "part of the reason as to why I don't like school." R.P. indicated he sweats a lot but "still made attempts to keep myself clean even though it was still difficult."

**{¶ 52}** Ta.P., R.P.'s sister, testified R.P. has a strong bond with his kids. Ta.P. said R.P. was best friends with their dad and since his death, R.P. has been withdrawn.

**{¶ 53}** S.P. testified she is R.P.'s mother and the children's grandmother. She indicated J.B. lived with her on two separate occasions, once in 2008 and then in about 2010, and A.P. lived with her in 2010. At that time, S.P. lived about a half mile from appellants' home. R.P. would visit with the children, sometimes three or four times a week, and the kids were happy to see him. She said R.P. wants his babies back home and he has done everything that children services asked for. S.P. stated she gets frustrated with mother sometimes. S.P. testified when J.B. lived with her in 2011, S.P. noticed J.B. was behind in school, so S.P. asked J.B.'s teacher, Nikki Lee, for some extra schooling, which Lee provided and J.B. was doing better. S.P. feels it is in the children's best interest to be returned to appellants' home.

21.

{¶ 54} As to J.B.'s father, R.B., Beeker indicated she had minimal contact with him overall, and her last contact with him was in March 2013. At that time, R.B. told Beeker it would be too complicated to add J.B. into his family. Since then, Beeker has attempted to contact him, but R.B. has never responded. R.B. was not at the trial.

**The Court's Findings of Fact, Conclusions of Law and Judgment Entry**
**(Filed February 6, 2014, Journalized March 4, 2014)**

{¶ 55} The trial court set forth in its judgment that after considering the testimony, exhibits and other evidence presented at the hearing, it made numerous findings, by clear and convincing evidence. The court noted the extensive testimony regarding the children's medical, educational, social and developmental problems, all of which favors the granting of permanent custody to the agency. The court found, at the time of the hearing, the children's needs had been adequately addressed in their placements and "they have flourished in areas where there were previously serious struggles." The court further found the children responded well to the stable and consistent environment in their placements, and had all made substantial progress, improving "physically, socially educationally, medically, emotionally and developmentally." The court mentioned it conducted an in-camera interview of all four children, but given the children's ages, the interview was of little legal or persuasive value. Nonetheless, the court observed "the children did express some trepidation regarding going back home" with appellants, and the older children stated they wanted to be "safe."

22.

{¶ 56} As a preliminary matter, we note the trial court's findings of fact are quite conclusory. When making factual determinations in these types of judgments, the trial court must adequately explain its reasoning so as to permit thorough appellate review. *In re Ethington*, 11th Dist. Trumbull No. 98-T-0084, 1999 WL 562714, *3 (July 23, 1999). Here, although the trial court did not set forth a detailed recitation of the underlying facts and evidence which supported its ultimate findings, the trial court's conclusions are sufficient to permit a proper appellate review. Moreover, the overall record of the case contains all of the necessary factual evidence to support the trial court's findings.

{¶ 57} The court found appellee made reasonable efforts to return the children to their parents by offering the parents services, including but not limited to the following agencies and programs: agency visits and assistance, Board of Developmental Disabilities, case management and planning, caseworker counseling and services, individual and couples counseling, developmental disability services, early intervention, Help Me Grow, information and referral services, mental health and cognitive assessment, parent aide, parent education, P.R.C. assistance, protective daycare, speech therapy, support services from other community agencies, relatives and friends, transportation by the agency, TRIPS, Village House, visitation services by the agency and a volunteer case with the agency.

{¶ 58} The court found, however, all of the parents have consistently failed to make the children a priority in their lives, and have failed to take advantage of the

23.

resources and services offered over time to improve the situation. The court further found the parents have continuously and repeatedly failed to substantially remedy the conditions which caused the children to be placed outside of the home. The court noted all of the parents' lack of commitment to the children by their actions and inactions, which showed their general unwillingness or inability to provide an adequate and permanent home for the children. The court also noted all of the parents, through their actions and inactions, are unwilling to provide food, clothing, shelter, and other basic necessities for the children and are unwilling or unable to prevent the child from suffering emotional or mental neglect or abuse. In addition, the court observed all of the parents, through their actions and inactions, have shown an unwillingness or inability to adequately care for the children's medical, educational, social and developmental needs.

**{¶ 59}** Concerning C.P., the court found, based upon Dr. Schlievert's medical expert testimony, there was a "pattern of neglect" serious enough that it impacted C.P.'s overall development.

**{¶ 60}** It was also found by the court that both fathers have failed to consistently financially support their child or children as ordered by the court.

**{¶ 61}** With respect to R.B., the court noted although R.B. was notified, he failed to participate in case plan services or attend hearings. The court found R.B. failed to visit or maintain contact with J.B., thus legally constituting abandonment.

24.

**The Appeal**

{¶ 62} Mother argues in her first assignment of error that the evidence submitted at trial was insufficient to support the trial court's grant of permanent custody. R.P. argues in his first assignment of error that the trial court's decision was against the manifest weight of the evidence. These assignments of error will be addressed together.

**A. Standard—Permanent Custody**

{¶ 63} A trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. The factual findings of a trial court are presumed correct since, as the trier of fact, the court is in the best position to weigh the evidence and evaluate the witnesses' testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 64} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, two statutory prongs: (1) the existence of at least one of the four factors set forth in R.C.

25.

2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6. Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### B. Factors Under R.C. 2125.414(B)(1)(a)-(d)

{¶ 65} The first prong of the permanent custody analysis requires the court to make a finding, by clear and convincing evidence, of one of the factors under R.C. 2151.414(B)(1).

{¶ 66} R.C. 2125.414(B)(1) states:

> [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned * * *.

(d) The child has been in the temporary custody of one or more

public children services agencies or private child placing agencies for

twelve or more months of a consecutive twenty-two-month period * * *.

### 1. Trial Court's Finding Under R.C. 2151.414(B)(1)(d)

{¶ 67} Here, mother contends the trial court erred in finding, pursuant to R.C. 2151.414(B)(1)(d), that T.P. and C.P. had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. R.P. joins and adopts mother's arguments.

{¶ 68} An agency may not use the statutory provision dealing with children in temporary custody for 12 months of a 22-month period where the agency's motion is filed prior to the required statutory time period. *See In re Bowers*, 7th Dist. Mahoning No. 04 MA 216, 2005-Ohio-4376, ¶ 41, which cites R.C. 2151.413(D)(1) and *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.

{¶ 69} T.P. and C.P. were adjudicated dependent on April 8, 2012, the date when appellee's temporary custody began. Appellee filed its motion for permanent custody on July 24, 2013, approximately 15 months later. Although the children were in the temporary custody of appellee for at least 12 months, the 22-month consecutive time period was not complete when appellee filed for permanent custody. However, this error may be rectified "'[i]f a ground other than R.C. 2151.414(B)(1)(d) exists to support a grant of permanent custody, the agency may move for permanent custody on that other ground.' *In re C. W., supra,* ¶ 27." *In re E.P.*, 6th Dist. Wood No. WD-09-070, 2010-Ohio-3529,

27.

¶ 59. Since findings under R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *See In re Langford Children*, 5th District Stark. No. 2004CA00349, 2005-Ohio-2304, ¶ 17.

{¶ 70} Here, the court also found, in accordance with R.C. 2151.414(B)(1)(a), that the children cannot be placed with appellants within a reasonable time or should not be placed with appellants.

## 2. Trial Court's Finding Under R.C. 2151.414(B)(1)(a)

{¶ 71} Mother argues the trial court erred in finding, pursuant to R.C. 2151.414(E)(1), (4) and (14), that the children cannot be placed with her within a reasonable time. Relatedly, R.P. contends the children can be placed with appellants within a reasonable time. He notes the trial court did not specifically enumerate which factors it found, but it appears the court alludes to R.C. 2151.414(E)(1), (2), (3), (4), (14), (15) and (16).

{¶ 72} A finding under R.C. 2151.414(B)(1)(a) requires a determination that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. R.C. 2151.414(E) directs a court to "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" where it finds by clear and convincing evidence that "one or more" of the factors listed under R.C. 2151.414(E) exist. R.C. 2151.414(E)(1) states:

28.

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

### 3.  Trial Court's Finding Under R.C. 2151.414(E)(1)

{¶ 73} Mother states appellee developed a parenting plan after the children were removed from the home, which set forth the following issues that needed to be addressed: the hygiene of the children and appellants, child development expectations, the children's school attendance and the children's routine.

{¶ 74} Concerning hygiene, mother claims the odor issues with the children appear to have resulted from the children urinating in their clothing and bedding, and improper cleaning of the clothes which led to the older girls' rashes.  Mother contends she was given assistance with bathing the children and how to clean laundry appropriately, and learned how to address the children's hygiene issues.  As to

29.

appellants' odor issues, mother submits appellants testified about some medical issues that could have caused the odor. Mother insists "[w]hile parents having odor issues might be unpleasant, it is not a basis for the grant of permanent custody." In addition, mother asserts since the guardian ad litem reported there were no odor issues with appellants' new home, it is only logical that appellants have remedied their own odor issues.

{¶ 75} Mother contends she completed her assessment and treatment at Firelands, she voluntarily engaged in couple's therapy with R.P. starting in August 2013, her home was appropriate and had room for the children, she was taking her medication as prescribed, she was assessed for employment assistance and secured employment and she consistently attended visitation with her children and acted appropriately. Nonetheless, mother argues she was never given the opportunity to show she had remedied the circumstances which caused the children's removal as visitation was never increased from supervised to unsupervised.

{¶ 76} Regarding child development issues, mother acknowledges there was testimony that the children suffered from some developmental delays. Mother submits Dr. Schlievert, who treats C.P., indicated "there is a strong possibility that C.P.'s delays are genetic in nature." No genetic testing has been done, therefore mother claims "there is a strong possibility that C.P. and the other children's developmental delays are a result of a hereditary condition, and not based on neglect." Mother also states she frequently attended her children's IEP and medical appointments.

30.

{¶ 77} Concerning school attendance and establishing a routine for the children, mother contends she was offered assistance with and was willing to and capable of bathing the children in the morning then getting them dressed and off to school. Again, mother maintains she was not given the opportunity to demonstrate her abilities and show she had remedied the condition.

{¶ 78} Mother insists she substantially complied with her case plan goals and made great strides in improving the environment for her children upon their return home, yet, she was denied an opportunity to implement her new skills. Mother argues the state failed to prove by clear and convincing evidence that the reasons for the children's removal were not remedied by mother.

{¶ 79} R.P. asserts the children were initially removed from the home due to an allegation that mother slapped J.B., as well as "the odor/rash/hygiene issue." R.P. claims the slap was a one-time occurrence which did not appear to cause any lasting physical or emotional mark on J.B., and "the odor/rash/hygiene issue," arose mainly from the four children not being potty trained. He maintains all of the children, except C.P., are now potty trained. In addition, R.P. observes mother used to do laundry in cold water but now uses warm water, which "she noted was doing a better job cleaning clothes." R.P. further contends the apartment where appellants were living at the time of trial had no odor issues.

{¶ 80} As to his "purported lack of engagement," regarding services offered to appellants, R.P. claims the counselor to whom he was referred terminated him after only

31.

two sessions due to R.P.'s "failure to articulate items he needed to work toward fixing." R.P. submits it was likely he was depressed because at the time of the children's removal, he was still mourning the death of his father and another elder father-figure.

{¶ 81} R.P. maintains there was not clear and convincing evidence that the problems which caused the children's removal have not been remedied, or alternatively, that appellee established reasonable case planning and diligent efforts to assist him to remedy the problems.

{¶ 82} The record is clear that appellants love their children and often visited them throughout the case plan. The record shows mother has tried to comply with many of the case plan goals required of her for reunification with her children, however, she has been unable to remedy the conditions which led to the children's removal. The record reveals R.P. has not demonstrated a commitment to improving the conditions which led to the children's removal, and has, for the most part, refused to take advantage of the services necessary for reunification. The evidence shows that even after a good deal of assistance, appellants made little progress in their ability to understand and provide a safe environment for the children. The record is replete with evidence that the problems which caused the children's removal have not been remedied. For example, the foster mother and Kelly Beeker recounted their experiences regarding smelling odors on the children after visiting with appellants or in appellants' home after the children's removal. Linda McGilton and Christine Uribe also described in detail the ongoing odor issues appellants had after the children were removed from the home, which ultimately led to

32.

appellants' visitations with the children being decreased and then terminated at their facility. Linda Ackerman testified that although mother wants to do what is right, there is a "disconnect," where mother is doing something "because [she doesn't] want to be in trouble * ** * versus this is the best thing for my children." Kelly Beeker testified mother needs R.P. to help her with daily living and caring for the children as mother does not understand the children's developmental expectations and mother cannot focus her attention on making sure that all four children are safe, but R.P. appeared to be a very indifferent parent, who said helping his wife is like taking care of another kid. Christine Uribe testified there was not much cooperation between appellants during the visits, as R.P. would do "nothing" at the visits and did not initiate any interaction with the children. There was testimony that mother and R.P. did attend some of the children's IEP meetings, although Beeker testified R.P. does not go to the children's school visits because it makes him uncomfortable. There was also testimony that mother and R.P. attended some of the children's medical appointments, but not on a regular basis, and they were not there for A.P.'s eye surgery.

{¶ 83} With respect to mother's position that C.P. and the other children's developmental delays are the result of a genetic or hereditary condition, Dr. Schlievert opined "[t]hat there was neglect to a level that impacted [C.P.'s] overall development" and Dr. Jungblut opined that while genetic issues can cause developmental delays and genetics may play a role in C.P.'s delays, C.P.'s severe delays were most likely caused by environmental deprivation. Thus, the doctors opined neglect, not genetics, was the

33.

primary cause of C.P.'s delays. With respect to J.B., A.P. and T.P's developmental delays, there is no evidence in the record to support mother's position that their delays were the result of a hereditary condition.

{¶ 84} We have thoroughly reviewed the trial court record and find there is competent, credible proof which supports the trial court findings, under R.C. 2151.414(E)(1), by clear and convincing evidence, that despite the reasonable and diligent efforts of appellee in assisting appellants to remedy the problems that initially caused the children to be removed from the home, the conditions which caused the pattern of substantial and continuous neglect of J.B., A.P., T.P. and C.P. while in appellants' home, leading to the children's removal, have not been remedied so as to give the children the necessary parental care and protection. There is also competent, credible evidence in the record which supports the trial court finding, under R.C. 2151.414(B)(1)(b), by clear and convincing evidence, that J.B. has been abandoned by R.B.

{¶ 85} Based on the foregoing, the first part of the permanent custody analysis was satisfied, by clear and convincing evidence, pursuant to R.C. 2151.414(E)(1) as to appellants, and R.C. 2151.414(B)(1)(b) as to R.B. It is therefore not necessary for us address appellants' arguments concerning the trial court's findings under R.C. 2151.414(E)(2), (3), (4), (14), (15) and (16), as the trial court was required to find only one factor under R.C. 2151.414(E) to support its decision.

34.

## Best Interest Factors

{¶ 86} The second prong of the analysis requires the court to consider the best interest of the child. To satisfy the best interest prong of the permanent custody test, appellee was required to establish, by clear and convincing evidence, that permanent custody to the agency is in the best interest of the children based on an analysis under R.C. 2151.414(D). To that end, the trial court must consider all relevant factors, including: the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers; the wishes of the children; the custodial history of the children; the children's need for permanence; whether a parent has abandoned the child.

{¶ 87} Here, mother contends permanent custody is not in the children's best interest. R.P. joins and adopts mother's arguments. Mother says she has a very good relationship with her children and the children are happy to see her at their visits. Mother interacted appropriately with the children at visits, including reading books to the children, bringing snacks for the children and playing with the children. Mother submits there is a good bond between her and the children and the children with each other. Mother notes the children were too young to express their wishes of where to live, although none of the children indicated they did not want to live with mother. Mother insists she has remedied the circumstances which led to the children's removal from her home. Mother observes she has housing, transportation, employment and can provide for all four of her children's basic needs.

35.

{¶ 88} A review of the record shows the court considered the relevant factors under R.C. 2151.414(D)(1). Regarding the children's interaction and interrelationship with appellants and each other, the evidence is clear that the children love appellants and are happy to see them at visits. The evidence also shows J.B. and R.B. have never met, have no contact or relationship with each other and R.B. has abandoned J.B. The record further reveals the children are bonded with each other and their foster family. The court found each of the children improving physically, socially, educationally, medically, emotionally and developmentally. With respect to custodial history, the record shows a relative placement was attempted with the two older children; however the children were placed in foster care when the relative placement was unable to handle the children's behaviors. Concerning the wishes of the children, the court did conduct an in-camera interview with all four children, but found it "was of little legal or persuasive value [a]lthough the children did express some trepidation regarding going back home." The record further reveals the three older children did express their wishes to the guardian ad litem, with the two older children not wanting to go home and the other child wanting to go home. As to the children's need for permanence, the court noted the children's need for a legally secure permanent placement, and recognized an award of permanent custody would facilitate an appropriate and permanent adoptive home. In addition, the record shows that both the caseworker and the guardian ad litem testified permanent custody of the children and termination of appellants' rights are in the children's best interest. Based on our review of the record as summarized above, we find competent,

36.

credible evidence exists to support the trial court findings under R.C. 2151.414(D)(1), and the evidence is of the type to establish a firm belief or conviction that an award of permanent custody to appellee is in the best interest of the children.

{¶ 89} For the foregoing reasons, we find sufficient evidence to support the trial court's grant of permanent custody. We further find the trial court's judgment is not against the manifest weight of the evidence. Appellant mother and appellant father's first assignments of error are therefore not well-taken.

{¶ 90} In her second assignment of error, mother contends the trial court improperly allowed a witness who had not been sworn to testify. Mother asserts the court erred in considering as evidence the testimony of a witness who was not duly sworn. R.P. joins and adopts mother's argument.

{¶ 91} Evid.R. 603, R.C. 2317.30, as well as Section 7, Article I of the Ohio Constitution all require an oath be administered to a witness before the witness testifies. *In re Leonard H.*, 6th Dist. Lucas No. L-00-1258, 2001 WL 60694, *1 (Jan. 26, 2001). It is error for the trial court to admit unsworn testimony, but such error is waived if a timely objection is not made. *See Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). "'This is because the failure to administer an oath can easily be corrected at the time; an attorney may not fail to object and then cite the lack of an oath as error.'" (Citation omitted.) *In re Leonard H., supra*.

{¶ 92} Here, prior to the witness testifying, the trial court advised the witness of certain matters or manners, including to speak out loud and answer honestly. The witness

37.

responded, "okay." No objections to the lack of an oath were lodged before the witness testified. Rather, the issue was brought to the trial court's attention after the witness had testified and left the stand. In response, the following day, the trial court recalled the witness to the stand and asked her to reaffirm her testimony. The witness did so following an exchange with the trial court wherein the witness acknowledged she was "under the impression that I should tell the truth" when she testified the previous day. Considering the trial court's immediate correction of its failure to administer an oath to the witness after the issue was called to the court's attention, no plain error exists. Accordingly, appellant mother and appellant father's second assignments of error are not well-taken.

{¶ 93} In his third assignment of error, R.P. argues he was denied a fair trial and due process because the trial court allowed irrelevant, inadmissible and duplicative testimony. He further claims testimony relating to past investigations of the family should have been barred under the doctrine of issue preclusion. R.P. acknowledges no objection was made at trial to this problematic testimony.

{¶ 94} The admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. However, the failure to object to the admission of irrelevant or prejudicial evidence at trial waives all but plain error. *In re Ebenschweiger*, 12th Dist. Butler No. CA2003-04-080, 2003-Ohio-5990, ¶ 9. In a civil case, the plain error doctrine is limited to extremely rare cases where exceptional circumstances mandate its

38.

application such that where the error, if left uncorrected, challenges the legitimacy of the judicial process. *See Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122, 679 N.E.2d 1099 (1997). Plain error occurs when (1) there is an error, (2) the error is an obvious defect in the proceedings, and (3) the error affects the appellant's substantial rights, in other words, the error affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). *See also In re J.C.*, 2013-Ohio-2819, 994 N.E.2d 919, ¶ 10 (11th Dist.).

{¶ 95} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The issue of whether testimony is relevant or irrelevant is best determined by the trial court judge who is in a better position to analyze the impact of the evidence. *Columbus v. Taylor*, 39 Ohio St.3d 162, 164, 529 N.E.2d 1382 (1988). In a permanent custody case, "[t]o further the interests of the children, the court must consider any evidence available to it * * * [and] [s]ome of the most reliable evidence for the court to consider is the past history of the children and the parents." *In re Vaughn*, 4th Dist. Adams No. 00CA692, 2000 WL 33226177, *7 (Dec. 6, 2000).

{¶ 96} Here, R.P. contends the trial court allowed irrelevant and inadmissible testimony, including the testimony of four agency witnesses about past referrals regarding the family which were unrelated to this case and mostly found to be unsubstantiated, as well as prior investigations of the family. Considering the importance

39.

of the issues before the court, this was a case in which a great number of witnesses testified; 22 witnesses were called to testify over five days of trial. The information elicited from the four agency witnesses concerned just some of the family's contacts with appellee, as numerous other witnesses testified at trial with respect to facts directly related to this case. Information about the family's history with children services is clearly relevant and admissible in a permanent custody action, and it was well within the trial court's discretion to allow this testimony. *See Vaughn, supra.* Moreover, the errors alleged by R.P. do not satisfy the requirements of the plain error doctrine as there has been no showing that the trial court committed an error in allowing the testimony of the four witnesses, let alone that this testimony affected the result of the trial.

{¶ 97} Evid.R. 403(B) gives the trial court the discretion to exclude evidence if its probative value is substantially outweighed by consideration of undue delay or needless presentation of cumulative evidence.

{¶ 98} Here, the duplicative testimony of which R.P. complains involved several witnesses whose testimony was virtually identical. Under the plain error analysis, the witnesses' testimony does not constitute error as it has not been demonstrated that its duplicative nature altered or affected the outcome of the case.

{¶ 99} The doctrine of issue preclusion, also known as collateral estoppel, provides that "a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies."

40.

*Ft. Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.*, 81 Ohio St.3d 392, 395, 692 N.E.2d 140 (1998). "[T]he collateral estoppel aspect precludes the relitigation, in a second action, of an issue that had been actually and necessarily litigated and determined in a prior action that was based on a different cause of action." *Id.*

{¶ 100} Here, R.P. argues testimony relating to past investigations of the family should have been barred under the doctrine of issue preclusion. A review of the record shows there was no prior action involving permanent custody of the children, much less a final determination on that issue reduced to judgment. The doctrine of issue preclusion does not apply to this case. *See Matter of Holland*, 6th Dist. Lucas No. C.A. L-86-069, 1987 WL 7061, *1-2 (Feb. 27, 1987).

{¶ 101} For the foregoing reasons, appellant R.P.'s third assignment of error is not well-taken.

{¶ 102} In the fourth assignment of error, R.P. contends he was prejudiced by ineffective assistance of trial counsel because counsel failed to object to the voluminous amounts of irrelevant and inadmissible testimony entered into the record of the case. Specifically, R.P. argues appellee's theory of the case was "the family had horrible hygiene and the children had such severe physical and developmental problems that the parents, who also suffered limitations, could not be expected [to] mitigate the concerns" that led to the removal of the children. R.P. claims the hygiene issues have been mostly resolved with potty training and there was insufficient evidence that appellants could not care for the children, even with their special needs.

41.

{¶ 103} A party to a statutory proceeding for termination of parental rights is entitled to counsel and counsel must be effective. *Jones v. Lucas Cty. Children Services Bd.*, 46 Ohio App.3d 85, 86, 546 N.E.2d 471 (6th Dist.1988). In Ohio, a properly licensed attorney is presumed competent and it is appellant's burden to prove counsel was ineffective. *State v. Hamblin*, 37 Ohio St.3d 153, 155-56, 524 N.E.2d 476, 479 (1988). Appellant must demonstrate counsel made errors so serious that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant must also establish the deficient performance prejudiced his defense. *Id.* To establish prejudice, appellant must show there is a reasonable probability that but for counsel's deficiencies, the outcome of the trial would have been different. *Id.*, citing *Strickland, supra*.

{¶ 104} Here, R.P. was appointed counsel by the trial court, pursuant to R.C. 2151.352. R.P. argues counsel was deficient in failing to object to testimony which R.P. considers irrelevant and inadmissible; however, he fails to specify which witness or what testimony was irrelevant and inadmissible in his view. Because R.P. fails to point to any instances in the record or to otherwise substantiate his argument, he has not established his counsel's performance was deficient. Accordingly, we find R.P. has failed to show his trial counsel's performance was deficient or counsel's representation was ineffective. Appellant R.P.'s fourth assignment of error is not well-taken.

42.

**{¶ 105}** On consideration whereof, the judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Costs of this appeal are assessed to appellants pursuant to App.R. 24. The clerk is ordered to serve all parties with notice of this decision.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
JUDGE

Arlene Singer, J.     

Thomas J. Osowik, J.      _____
CONCUR.      JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.